IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    : NO. 4:17-CR-00139
                                         :
       v.                               : (Judge Brann)
                                         :
JUSTIN DANIEL LOUGH        : (Electronically Filed)
                    Defendant      :

## SENTENCING MEMORANDUM

## I.    INTRODUCTION

The statutory mandatory minimum term of imprisonment required in this case – 120 months – is a significant period of time for Justin Lough, who before this indictment in this case, had never served more than a stretch of four days in jail.  In fact, throughout his adult life, he maintained legitimate employment and avoided any serious contact with the criminal justice system.

In April 2017, Mr. Lough was charged for his participation in a scheme to transport methamphetamine across state lines.  In April 2019, after two years in pretrial custody, he entered into a plea agreement with the Government, agreeing to plead guilty to Count 7, conspiracy to distribute and possess with intent to distribute a mixture or substance containing 500 grams or more of methamphetamine.  (Doc. 337 at 1).

On June 3, 2019, Mr. Lough appeared before this Honorable Court and followed through with the signed plea agreement, specifically pleading guilty to Count 7 of the indictment.  Sentencing is scheduled for March 18, 2020.  This sentencing memorandum is submitted to address the objections to the presentence report and to discuss the various factors that warrant a variance from the otherwise advisory sentencing guideline range.

## II.    ADVISORY GUIDELINE RANGE

### A.    The Initial and Revised Presentence Reports.

On September 9, 2019, the United States Probation Office disclosed its initial presentence investigation report.  (Doc. 356)("Initial PSR").  The Probation Officer determined that Mr. Lough and his codefendants were responsible for 64 pounds of methamphetamine or 29.03 kilograms.  (Initial PSR ¶¶ 35, 40).  In the 2018 Guidelines Manual, at least 15 kilograms but less than 45 kilograms of methamphetamine results in a base offense level of 36.  (Initial PSR ¶ 40).   Mr. Lough received a two-level enhancement "because firearms were possessed" under Section 2D1.1(b)(1), (Initial PSR ¶ 41), and a three-level reduction for acceptance of responsibility under Section 3E1.1, (Initial PSR ¶ 47), resulting in a total offense level of 35. (Initial PSR ¶ 48).

With respect to acceptance of responsibility, the initial presentence report

states as follows:

> Based on [Lough's] guilty plea, and his admission to the Court and
> probation officer, a two-level reduction appears warranted.  Upon
> motion of the government stating that the defendant has assisted
> authorities in the investigation or prosecution of his own misconduct
> by timely notifying authorities of his intention to enter a plea of guilty
> an additional one-level reduction is warranted.

(Initial PSR ¶ 47).

Mr. Lough was assessed two criminal history points, 1 point for a driving

under the influence conviction and 1 point for a conviction for "petit larceny less

than $200 not from a person."  (Initial PSR ¶¶ 50, 52).  He was assigned a criminal

history category of II.  (Initial PSR ¶ 56).  A total offense level of 35 and a

criminal history category of II puts him in an advisory guideline range of 188 to

235 months.  (Initial PSR ¶ 86).

Mr. Lough filed factual and legal objections to the presentence report.  The

Government did not.  *See* (Doc. 375 at 1)(PSR – Addendum).

Mr. Lough legally objected to the base offense level of 36 "because the

transactions did not involve either pure methamphetamine or a mixture containing

a detectable amount of methamphetamine." (Doc. 375 at. 9).  He also objected to

the 2-level enhancement for possession of firearms.  *Id.*

On December 12, 2019, the United States Probation Office disclosed the

final presentence report.  (Doc. 374)("PSR").  Paragraph 35 remained the same:

"Lough and his codefendants were responsible for 64 pounds of methamphetamine."  But, without any suggestion from the Government, the Probation Office raised the base offense level to 38 because it determined that the transaction on December 4, 2016, involved 16 pounds of "crystal methamphetamine ('Ice')."[1]  (PSR ¶ 40).  Also, the Probation Office removed the three-level reduction for acceptance of responsibility because, in its view, "Lough now objects to a large majority of the government's statement of facts."  (PSR ¶ 47).  Consequently, Mr. Lough's total offense level rose to 40.  (PSR ¶ 48).  An offense level of 40 and a criminal history category of II puts Lough in an advisory guideline range of 324 to 405.  (PSR ¶ 86).

### B.    The Base Offense Level Should Be at Most 36.

This case involved simulated methamphetamine supplied by law enforcement officers to Mr. Lough and his co-defendants to be delivered to other law enforcement officers.  There was never any methamphetamine involved.  *See* (Doc. 331 at 23).  The substance provided was either rock salt, bath salt or a combination of both.  Nevertheless, Mr. Lough acknowledges that an individual can be prosecuted under 21 U.S.C. § 841 "even if the purported drugs turn out to be a non-controlled substance." *United States v. Cooper,* 121 F. 3d 130, 135 (3d

---

[1] In the Memorandum of March 5, 2019, Your Honor recognized that "none of the alleged conspirators were charged in the indictment for their participation in this first run of methamphetamine."  (Doc. 331 at 20-21).

Cir. 1997). Thus, he may be held responsible for the total amount of fake

methamphetamine involved in the transactions. But Mr. Lough should not be held

responsible for any quantity of "Ice."

After Mr. Lough presented objections to the presentence report, the

Probation Office revised the report, characterized the methamphetamine from the

December 4, 2016 controlled transaction as "Ice" and increased the base offense

level to 38.

Within the Sentencing Guidelines, "Ice" means "a mixture or substance

containing d-methamphetamine hydrochloride of at least 80% purity." U.S.S.G.

§ 2D1.1 (Notes to Drug Quantity Table (C)). At the first controlled transaction in

December 2016, which was not even specifically charged in the indictment, the

law enforcement officer advised the participants that he had "18 pounds of

crystal." (PSR ¶ 11). Yet there is no reason to believe that the law enforcement

officer meant to imply that the substance he had was "a mixture or substance

containing d-methamphetamine hydrochloride of at least 80% purity." Further,

there is no reason to believe that Mr. Lough understood that by "crystal" the law

enforcement officer meant "Ice" as defined in the Sentencing Guidelines. This

"relevant conduct" which did not actually involve "Ice" and could not fairly be

characterized as involving "Ice" under the definition within the Guidelines, should not be used to increase the base offense level from 36 to 38.[2]

### C.   The Firearm Enhancement Should Be Eliminated.

As noted, the Probation Office added two levels to the base offense level "because firearms were possessed."  (PSR ¶ 41).   According to the commentary to Section 2D1.1, "[t]he enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons." U.S.S.G. § 2D1.1, comment. (n.11(A)).  The commentary explains that "[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  *Id.*

The firearms in question consisted of fifty (50) Colt AR-15 lower receivers and four (4) Glock sear full automatic inserts. (Doc. 12 at 28).  These gun parts were introduced to the drug transaction of April 7, 2017 by undercover government agents.  They were not connected to the offense in the traditional sense.  The firearms were part of the offense, just as the simulated methamphetamine was part of the offense.  Law enforcement officers supplied Mr. Lough and his co-

---

[2] Alternatively, if Your Honor concludes that the law enforcement officers reference to "18 pounds of crystal" in a transaction that was not charged in the indictment is "Ice" as defined by the Guidelines and is worthy of a 2-level increase in the base offense level, Mr. Lough seeks a downward variance from the guideline range because the offense level overstates the seriousness of the offense.

defendants with the gun parts as well as the simulated methamphetamine to transport.  But the firearms were not used by a drug trafficker to protect his drugs or in any way that increased the danger of violence in the offense.   Because this is not the scenario the Sentencing Commission intended in creating the specific offense characteristic for the possession of firearms during a drug trafficking offense, the two-level enhancement should be eliminated.

To be sure, the definition of firearm includes "the frame or receiver," U.S.S.G. § 1B1.1(H), but firearm is parenthetically included as a specific offense characteristic in the broader dangerous weapon requirement: "If a dangerous weapon (including a firearm) was possessed, increase by **2** levels." U.S.S.G. § 2D1.1(b)(1).  Dangerous weapon is defined as follows:

> (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g. a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

U.S.S.G. § 1B1.1(E).

The question therefore is whether the firearms involved in the April 2017 transaction, qualify as dangerous weapons.   The Eighth Circuit considered this enhancement for a defendant who "kept a sawed-off rifle at his home, where police also found evidence of meth manufacturing." *United States v. Annis,* 446 F.3d

852, 856 (8th Cir. 2006).  The defendant argued the sawed-off rifle was not a dangerous weapon at the time of the police search "because the gun was missing the clip and the bolt." *Id.* at 857.  The Eighth Circuit found two reasons to apply a two-level enhancement under 2D1.1(b)(1): the appellant "could easily 'make the rifle operational in just a few seconds by putting the bolt (and the clip) in'" and "[e]ven partially disassembled, the gun is still a dangerous weapon because it not only closely resembles such an instrument, but also was used in a manner that created the impression it was a working gun."  *Id.* at 857.

In a Fifth Circuit case the defendant was driving a brown van that was pulled over by a police officer. *United States v. Ryles,* 988 F.2d 13, 14 (5th Cir. 1993). A shotgun was discovered in the van along with drugs, but the defendant objected to an increase in his offense level under "§2D1.1(b)(1) … because the shotgun found in the van was disassembled." *Id.* at 15.  Before sentencing it was determined "the barrel was removed from the stock (but) … the gun could have been assembled in thirty seconds." *Id.* at 16. Accordingly, "[b]ecause Ryles' disassembled shotgun could have been 'readily converted' to an operable firearm (in thirty seconds), the district court properly imposed a § 2D1.1(b)(1) increase in Ryles' offense level." *Id*. at 16.

In this case the government agents placed machine gun receivers and inserts in the back of Mr. Lough's vehicle along with the imitation methamphetamine, but

there is no evidence these parts that were introduced to the drug delivery by the agents were in a form that rendered them serviceable as weapons, either right away, or in a short period of time, in the event the conspirators were faced with a confrontation with law enforcement or rival drug traffickers.  As the First Circuit has stated if "the weapon's location makes it readily available to protect either the participants themselves during the commission of the illegal activity or the drugs and cash involved in the drug business, there will be sufficient evidence to connect the weapons to the offense conduct." *United States v. Corcimiglia,* 967 F.2d 724, 727-28 (1st Cir. 1992).

The Government has not provided any evidence that the parts supplied by the agents during the April 2017 transaction either looked like operable weapons or that the parts could have easily been converted into operable weapons during their course of delivery to the undercover agent who received them.  Accordingly, unless the Government meets its burden of establishing the firearms in the transaction of April 2017, qualify as dangerous weapons, *see United States v. Napolitan,* 762 F. 3d 297 (3d Cir. 2014), the objection to the two-level enhancement under § 2D1.1(b)(1) should respectfully be sustained.[3]

---

[3] Alternatively, if Your Honor concludes that the two-level enhancement for possession of firearms is a proper application of Section 2D1.1(b)(l) in this instance, Mr. Lough seeks a downward variance from the guideline range because the offense level overstates the seriousness of the offense.  Mr. Lough is receiving

### D.    Mr. Lough Accepted Responsibility.

During the guilty plea hearing, Mr. Lough accepted responsibility for the

conspiracy in Count 7 of the indictment and has not done anything inconsistent

with acceptance.  In the initial presentence report, the Probation Office agreed that

Mr. Lough accepted responsibility by entering his plea and admitting his

involvement in the conspiracy.  (Initial PSR ¶ 47).  But in the final presentence

report, the Probation Office changed its position.  (PSR ¶ 47).  The final version of

paragraph 47 provides:

> Despite pleading guilty – and previously **agreeing to the
> government's statement of facts** – Lough now objects to a large
> majority of the government's statement of facts. As the defendant no
> longer "clearly demonstrates" acceptance of responsibility as required
> under USSG § 3E1.1(a), a reduction is not warranted.

(PSR ¶ 47)(emphasis added).

Notably, the offense conduct recounted in the final presentence report was

identical to the offense conduct recounted in the initial presentence report.

*Compare* Doc. 356 at ¶¶ 5-35 *with* Doc. 374 at ¶¶ 5-35.  Moreover, a comparison

of the offense conduct in both presentence reports with the statement of facts read

into the record by the Government on June 3, 2019, (Doc. 377 at 20-36), readily

reveals that the Probation Officer fully adopted, without change, the language that

---

the same 2-level enhancement applicable to drug traffickers who possesses a fully
operable handgun during a drug delivery to protect themselves and their drugs.

was read into the record by the prosecutor at the plea hearing.  Notably, however, after the factual basis for the plea was read into the record by the prosecutor, Your Honor asked Mr. Lough if he "fully admit(s) to those facts." *Id.* at 36-37.  At that point undersigned counsel advised the Court of language in the factual basis "with which we disagreed." *Id.* at 37.  Before undersigned counsel described the various changes to the factual basis for the plea, the prosecutor acknowledged he had reviewed Mr. Lough's changes and deletions before Your Honor took the bench and the prosecutor stated "the items the defendant had issue with were relatively small, and I don't think they would affect the taking of a guilty plea." *Id.* at 37.

After the prosecutor's characterization of Mr. Lough's changes, the Court permitted the undersigned to summarize the changes to the factual basis on the record.  *Id.* 38-42.  Following the summarization, the prosecutor asked follow-up questions of Mr. Lough related to the charges to which Mr. Lough was pleading guilty.  *Id.* 42-45.  Thereafter, Your Honor accepted Mr. Lough's plea without reservation.  *See id.*

Significantly, undersigned counsel represented to the Court "we don't believe that any of the changes that we suggested have an impact on my client's accepting responsibility for count seven, to which he is pleading to today." *Id.* Your Honor then asked the prosecutor if he agreed with undersigned's assessment and the prosecutor responded: "We totally agree with that, Your Honor." *Id.*

Further, undersigned counsel "thought a good idea would be to make a copy (of the revisions to the statement of offense conduct) and provide it to Mr. Vought … and Mr. Rocktashel." *Id.* at 45. The Court responded "I think what I would do is make a copy of that, or my staff can do it for you, and provide it to the probation office and to Government counsel." *Id.*

The offense conduct set forth in paragraphs 5 – 35 of both presentence reports does not include any of the corrections and deletions brought to Your Honor's attention at the guilty plea hearing on June 3, 2019.  Based on the representation of the Probation Officer that Mr. Lough had previously agreed with the statements of fact read into the record by the prosecutor, it may be that the Probation Officer did not actually receive a copy of the edited statement of offense conduct.  But it is clear from the record that all of Mr. Lough's factual changes were discussed at the time of the plea and with the agreement of the prosecutor that the changes did not impact Mr. Lough's acceptance of responsibility for the offense.

In addition to the above, it is readily clear from the transcript of the plea hearing that Mr. Lough fully accepted responsibility for possessing imitation methamphetamine with the intent to deliver and delivering imitation methamphetamine. The question and answer colloquy between Mr. Lough and the prosecutor supports Lough's position:

MR. ROCKTASHEL: Do you agree that during the period set forth in the indictment, you agreed with Steever, Robards and Dykes to transport multiple pound quantities of what you believed were crystal meth?

THE DEFENDANT:  Yes, I will agree with that.

MR. ROCKTASHEL: And do you agree that you understood that that conduct was illegal, that it was wrong?

THE DEFENDANT: Yeah.

MR. ROCKTASHEL: And you, nevertheless, continued to agree and actually transported what you believed were the bulk quantities of the meth. Is that correct?

THE DEFENDANT: Right.

MR. ROCKTASHEL: In fact, you use your own vehicle to assist in that process in providing security, or muscle, or an escort, if you will, during the transportation of the meth. Is that right?

THE DEFENDANT: Right ….

MR. ROCKTASHEL: And you were agreeing that on four separate occasions you helped transport multiple pound qualities (sic) of what you believed was crystal methamphetamine?

THE DEFENDANT: Right.

MR. ROCKTASHEL: And you received a payment for providing that transportation service with your own vehicle. Is that correct?

THE DEFENDANT: Right.

(Doc. 377 at 43-45).

Mr. Lough "truthfully admitted the conduct comprising the offense(s) of conviction" and did not "falsely deny" relevant conduct.  He submitted factual objections to the initial presentence report because the probation officer did not take into account the factual edits that were summarized at the plea hearing and that were distributed to Probation and the Government after the plea hearing.

13

It is clear from the record established in this case that Mr. Lough has fully accepted responsibility for violating the law – specifically count 7 of the indictment in which he is charged with conspiracy to distribute and possess with the intent to distribute "a mixture or substance containing 500 grams or more of methamphetamine." (Doc. 12 at 19).  Furthermore, Mr. Lough affirms in this memorandum that he is guilty of the crime to which he pleaded guilty and accepts full responsibility for his criminal actions.

### E.  The Advisory Guideline Range Should Be 151 to 188 Months.

Based on the above objections to the presentence report, Mr. Lough's base offense level should be set at 36.  Without the two-level enhancement for possession of firearms and with a three-level reduction for acceptance of responsibility, Mr. Lough's total offense level should be 33.  An offense level of 33 and a criminal history category of II results in an advisory guideline range of 151 to 188 months.

## III.  The Section 3553(a) Factors Support a Downward Variance from the Advisory Guideline Range.

### A.  The Nature and Circumstances of the Offense and the History and Characteristics of Justin Lough Support a Sentence at Variance with the Advisory Guideline Range.

In determining a sentence which is sufficient but not greater than necessary to comply with the purposes of sentencing, the sentencing court must consider the

history and characteristics of the offender and the nature and circumstances of the offense.  18 U.S.C. § 3553(a)(1).  Following an extensive hearing and Your Honor's 90-page Memorandum Opinion of March 5, 2019, (Doc. 331), Your Honor is quite familiar with the nature and circumstances of the offense.

Law enforcement officers learned about a group known as Aryan Strikeforce (ASF) and devised a plan to infiltrate the group to gain more intelligence.  (Doc. 331 at 4).   An FBI Undercover Employee (UCE) met with Mr. Lough, a suspected member of the ASF, at a restaurant in Virginia.  (Doc. 331 at 17).  The purpose of this meeting was to discuss whether Mr. Lough and others were willing to assist in the transportation of illegal contraband, specifically narcotics, in return for payment.  (Doc. 331 at 18).  Mr. Lough agreed to use his vehicle and to be the driver.  *Id.*

Law enforcement officers proposed the sale of methamphetamine, provided the simulated methamphetamine and provided the purchaser.  The Government also provided the money. Law enforcement officers did the same with respect to the gun parts.  Mr. Lough showed up at the designated locations and did whatever he was instructed to do.

Significantly, from the beginning of the scheme, it was apparent to law enforcement that Mr. Lough maintained a legitimate job.  He advised at the first meeting that "he had off of work each week from Friday through Sunday.  *See*

(Doc. 331 at 18) (quoting an FBI 302).  He worked as a mason, but was struggling to make ends meet.  As Your Honor noted, Mr. Lough and the others "were thrilled to be paid for their participation."  (Doc. 331 at 21).  This is because Mr. Lough could use some extra money at that time.

Just before turning 18, Mr. Lough earned his GED.  (PSR ¶ 77).  He spent some time at a technical college in Tucson Arizona before returning to his home in Waynesboro, Virginia.  (PSR ¶ 75).  While living in Arizona, he worked as an overnight stocker in both a Kmart and a Walmart.  (PSR ¶¶ 80-81).  In Virginia, he worked construction jobs and then became a stone mason apprentice.  (PSR ¶¶ 78-79).  At the time of this offense, Mr. Lough was working as a mason earning $14 per hour.  (PSR ¶ 77).

Mr. Lough does not have an extensive criminal record.   His first offense occurred in 2011 when he was 20 years old and was arrested for driving while intoxicated in Virginia.  (PSR ¶ 50).  He was sentenced to 60 days imprisonment which was suspended.  He was also sentenced to pay a fine, a portion of which was suspended and to a 1-year suspension of his driver's license.  (PSR ¶ 50).  A few months later, he failed to appear in court for an underage possession of alcohol charge and was ordered to pay a fine.  (PSR ¶ 51).  His next offense came at the age of 24 when he pleaded guilty to "petit larceny less than $200 not from a person" and was sentenced to 60 days imprisonment, of which 56 days were

suspended, and restitution in the amount of $12.  (PSR ¶ 52).  His only other term

of imprisonment was imposed on some type of "show cause" – 30 days

imprisonment with 26 days suspended.  (PSR ¶ 54).  Mr. Lough's last contact with

the criminal justice system was a "capias" in Virginia in August, 2015, and he was

ordered to pay the costs.  (PSR ¶ 55).  Mr. Lough was not on probation or parole or

otherwise serving any sentence at the time of his involvement in the current

offense.

> **B.   A Sentence at Variance with the Advisory Guideline Range is Sufficient, But Not Greater Than Necessary, To Comply With the Purposes of Sentencing Set Forth at 18 U.S.C. § 3553(a)(2).**

Although Mr. Lough's participation in the offense is serious, it cannot be

disregarded that the Government planned the offense, provided the simulated

methamphetamine and gun parts, and provided the purchaser and the money for

those items.  Thus, the mandatory minimum term of imprisonment reflects the

seriousness of the offense.  Moreover, no other purpose of sentencing will be

advanced by keeping Mr. Lough in prison for more than the mandatory minimum

term.  He is educated and has vocational skills sufficient to resume legitimate

employment upon his release from custody.  Even at the mandatory minimum

term, Mr. Lough will be in his late 30's when he is released.

**C.      A recognition of sentencing manipulation would support a sentence below the mandatory minimum term of ten years in this case.**

Azkia Washington was indicted in the Eastern District of Pennsylvania in April of 2013; he was specifically charged with Hobbs Act robbery violations, firearms offenses, and attempt, as well as conspiracy, to possess with intent to distribute five (5) kilograms or more of cocaine.  *United States v. Washington,* 869 F.3d 193, 199 (3d Cir. 2017). The indictment against Washington came about after ATF set up a "stash house reverse sting," *id.* at 196, with a co-defendant in southwest Philadelphia.  *Id.* at 196, 197.  The co-defendant, Dwight Berry, recruited Washington to rob the stash house.  *Id.*  When all the players arrived at the purported stash house, Washington, among others, was arrested by ATF.  *Id.*

Washington alleged the government engaged in outrageous conduct and requested that he be granted due process relief.  *Id.* at 209. The Third Circuit, while recognizing the continued viability of the *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), denied relief to Washington, finding his case to be more in line with the facts of *United States v. Dennis,* 826 F.3d 683, 694-95 (3d Cir. 2016).  869 F.3d at 209-10.

Washington also requested relief on the ground that the government engaged in sentencing manipulation, which affected the advisory guidelines that governed

his sentencing hearing.  *Id.* at 210.  Our Circuit then took the time to discuss

sentencing factor manipulation beginning with a quotation from a sister circuit:

> [S]entencing factor manipulation occurs when the government's
> manipulation of a sting operation, even if insufficient to support a due
> process claim, requires that the manipulation be filtered out of the
> sentencing calculus. Outrageous government conduct would
> necessitate the reversal of a defendant's conviction, while sentencing
> factor manipulation would simply reduce the sentence applied to his
> conduct…. When a court filters the manipulation out of the sentencing
> calculus before applying a sentencing provision, no mandatory
> minimum would arise in the first place.

*Id.* at 210 (quoting *United States v. Ciszkowski,* 492 F.3d 1264, 1270 (11th Cir.

2007)).

While not ruling out the potential applicability of sentencing factor

manipulation in the Third Circuit, the *Washington* court cited two factors that made

it unnecessary to engage in the sentencing manipulation analysis in Washington's

case.  First, "because he was a career offender, Washington's Guidelines range was

not governed directly by the 10 kilogram drug-quantity amount[.]"  *Id.* at 211.

Second, the agent for the government "testified at trial that the amount chosen for

the sting was a 'conservative' number based upon the drug weights found in

'typical [Philadelphia] stash house.'"  *Id.* at 212.  The Third Circuit concluded

"that the 5 kilograms of cocaine charged in the indictment and found by the jury

did not amount to an impermissible manipulation of sentencing factors by the

government."  *Id.* at 213.

Unlike Washington, there is no documentary or testimonial basis in the record to conclude the criminal history of either Mr. Lough or his co-defendants "fit the required profile for a sting operation." *Id.* at 198.  Also, while Washington's guidelines were driven by his status as a career offender, Mr. Lough's guidelines are driven solely by the quantities of drugs chosen by the government agents and the gun parts that were provided by government agents. Significantly, and also unlike Washington, the government agents in this case have provided no factual and historical data to justify its decision to arrange for delivery of 48 pounds of methamphetamine, through four separate transactions, which according to estimates from DEA in 2017, would have a street value of between $1,219,255.30 and $2,194,272.00, taking into consideration area prices of between $56.00/gram to $100.00/gram.

The base offense level in this case is being applied to an individual who was not involved in any drug trafficking whatsoever at the time he was recruited to join the scheme or previously.  Furthermore, yet another two-level increase is being applied because of machine gun parts that, again, were introduced into one of the transactions by government agents, despite the absence of any history of firearms dealing on the part of Mr. Lough or any other individuals with whom he conspired. Arguably the Government could have chosen, for example, a total of 499 grams or less of methamphetamine, instead of 48 pounds, and it is just as likely Lough and

his co-conspirators would have happily accepted the Government's money for transporting and providing "security" for the transport. With a criminal history category of II and a base offense level of 28 applied to the 499 grams, Mr. Lough's guidelines calculation would begin at 87-108 months, rather than 210-262 months or 262-327 months. The bottom line is the actions on the part of government agents triggered the mandatory minimum term and dramatically increased the sentencing guideline range, which can be squarely characterized as sentencing factor manipulation.[4]

Circuit Judge McKee respectfully dissented in the *Washington* case. *Id.* at 223-34. Importantly, he offered some sentencing perspectives that are instructive in this case:

> Insofar as sentencing manipulation is concerned, "[t]he question is not whether the underlying criminal conviction is lawful, but rather whether there is reason to reduce the sentence due to the inducements used by undercover police or their agents." Moreover, "a sentence based on an evaluation of a defendant's culpability for particular offense conduct, which *includes* a consideration of police inducements," serves the retributive goals of "proportional and fair punishment," is "compatible with the consequentialist aims of incapacitation and deterrence," and is "directly supported by the

---

[4] According to the Third Circuit, sentencing entrapment "occurs when official conduct leads an individual otherwise indisposed to dealing in a larger quantity or different type of controlled substance to do so, and the result is a higher sentence." *See United States v. Sed*, 601 F.3d 224, 230 (3d Cir. 2010)(internal quotation omitted). And sentencing factor manipulation "occurs when the government unfairly exaggerates the defendant's sentencing range by engaging in a longer-than-needed investigation and, thus, increasing the drug quantities for which the defendant is responsible." *Id.* at 231 (internal quotation omitted).

systemic goal of identifying less blameworthy defendants and mitigating their sentences accordingly." These fundamental principles of criminal justice necessitate closer scrutiny for schemes that originate with, and are driven by, law enforcement because it is highly intended to apply to such circumstances." This scrutiny is appropriate even absent specific evidence that the government "intended" to inflate a defendant's sentence.

. . .

I would emphasize however, that *Twigg* does not defeat any claim of sentencing manipulation. Indeed, if anything, *Twigg* strongly suggests that we should recognize *some* kind of sentencing factor manipulation claim when appropriate. Although, for reasons the Majority explains, the conduct here may not have crossed the due process threshold, I believe Washington's sentencing manipulation claim is more meritorious than the Majority concludes.

. . .

It is difficult to believe that Congress ever considered requiring the imposition of a mandatory minimum sentence where 1) the sentence is tied to a fictitious drug quantity in a criminal endeavor that originates with the government, and 2) the defendant would not have engaged in the criminal conduct but for the government's prompting and encouragement.

Congress intended for the 10-year mandatory minimum sentences to apply to "major traffickers," i.e., "manufacturers or the heads of organizations." The 5-year mandatory minimums were intended to apply to "serious traffickers," i.e., "managers of the retail traffic … in substantial street quantities." Despite Congress's intention for mandatory minimums to reflect culpability based on drug quantities, the law instead has, over time, targeted low-level offenders (e.g., street-level dealers and couriers) more often than high-level offenders.

. . .

Thus, there is no reason to believe that Congress anticipated—much less intended—for quantity-based mandatory minimums to reflexively apply in stash-house cases where, as here, the defendant is not only a low-level "drug" offender, but also became involved with non-existent drugs at the government's urging.

. . .

Moreover, applying mandatory sentences where the criminal conduct and the type and quantity of drugs exist only in the law enforcement's

fertile imagination, rather than an offender's actual possession, defeats the congressional intent of requiring judges to impose sentences that are guided by the factors in 18 U.S.C. § 3553(a). In *United States v Olhovsky*, we stressed that "[18 U.S.C. §] 3553(a) clearly states that a court must impose a sentence that is "sufficient *but not greater than necessary*, to comply with the purposes of [sentencing].'" We there quoted the Supreme Court's admonition that this requirement, referred to as "the parsimony provision," is 18 U.S.C. § 3553(a)'s "overarching instruction.'" Despite our conclusion that 21 U.S.C. § 841(b)'s mandatory minimum sentence provision does not conflict with § 3553(a)'s parsimony provision, abandoning the "demand of parsimony that is the overarching instruction of the congressionally mandated sentencing factors" seems an unintended result in phony drug stings. There are no drugs that would otherwise endanger the community, and the criminal conspiracy probably would never have been hatched but for a law enforcement's intervention and direction. Congress could not have intended courts to impose otherwise applicable mandatory minimum sentences—which we have described as "draconian"—where the criminal conduct is the result of the government's initiative, rather than a defendant's. I also find it hard to believe Congress would create exceptions to mandatory minimums that spare actual drug traffickers exposure to draconian sentences while intending those same harsh sanctions to apply when the government lured a defendant into being involved with drugs that never even existed.

In addressing Congress's intent, I recognize that there is no ambiguity on the face of mandatory minimum sentencing statute. 21 U.S.C. § 841(b)(1) does not distinguish between roles in a narcotics conspiracy, nor does it require that drugs exist. This is not surprising, as it would have taken something approaching clairvoyance for Congress to foresee that these severe sentences would extend to situations where drugs were not actually involved. In any event, it is, of course, axiomatic that "[w]hen Congress establishes a minimum sentence for a particular crime, district courts are required to sentence defendants guilty of that crime to a term of imprisonment no less than the Congressionally prescribed minimum, unless an explicit exception to the minimum sentence applies." But as the U.S. Court of Appeals for the Eleventh Circuit explained, "[c]onceptually, … an adjustment for sentencing factor manipulation is not a departure" that the

mandatory minimum stature would otherwise forbid.  This is because "[w]hen a court filters the manipulation out of the sentencing calculus before applying a sentencing provision, no mandatory minimum would arise in the first place."

*Id*. at 230-33.

Considering the unique circumstances of this case, Your Honor should filter the manipulation out of the sentencing calculus and craft an appropriate sentence for Mr. Lough based on his individual culpability.

## IV.   Conclusion

For all the foregoing reasons, a sentence at variance with the advisory guideline range is sufficient, but not greater than necessary to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

Date:  March 9, 2020                    *s/Gerald A. Lord*
                                        Gerald A. Lord, Esquire
                                        Assistant Federal Public Defender
                                        Attorney I.D. # PA49539
                                        330 Pine Street, Suite 302
                                        Williamsport, PA 17701
                                        TEL: 570-323-9314
                                        FAX: 570-323-9836
                                        *Gerald_lord@fd.org*
                                        *Attorney for Justin Lough*

## <u>CERTIFICATE OF SERVICE</u>

I, Gerald A. Lord, Assistant Federal Public Defender, do hereby certify that this document, the foregoing **Sentencing Memorandum**, filed electronically through the ECF system, will be sent to the registered participants as identified on the Notice of Electronic Filing, including the following:

> George J. Rocktashel, Esquire
> Assistant United States Attorney

and by placing the same in the United States mail, first class, postage prepaid, at Williamsport, Pennsylvania, addressed to the following:

> Justin Lough

Date:  March 9, 2020                *s/Gerald A. Lord*
                            Gerald A. Lord, Esquire
                            Assistant Federal Public Defender